UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DION HARDAWAY #243916,

    Plaintiff,                Case No. 05-70362

v.                                  District Judge Avern Cohn
                                    Magistrate Judge R. Steven Whalen

OFFICER HAGGERTY, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Before the Court are Defendants' Amended Motion for Summary Judgment [Docket #76][1] and Plaintiff's Motion for Summary Judgment [Docket #77], which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that Defendants' motion be DENIED, and that Plaintiff's motion be GRANTED.

### I.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff, a prison inmate in the custody of the Michigan Department of Corrections ("MDOC"), filed a *pro se* civil rights complaint on February 16, 2005, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et.seq*.

The incidents that gave rise to this Complaint are alleged to have occurred while the Plaintiff was an inmate at the Ryan Correctional Facility (RCF) in Detroit, Michigan. *Complaint*, ¶2. Plaintiff states that on April 29, 2002, prison officials seized religious material from his cell and refused to return it to him. *Id.*, ¶¶14-16. The materials were related to the Nation of Gods and Earths / Five Percenters ("NGE"), a group Plaintiff states

---

[1] Amending and replacing Docket #75.

is religious in nature. On June 6, 2002, Plaintiff received notification that the NGE was classified as a Security Threat Group ("STG"), and that Plaintiff was found to be an NGE member, and thus subject to disciplinary action based on his possession of documents, publications and symbols related to the NGE. *Id*., ¶¶ 16-18. Plaintiff alleges that as the result of his own STG designation, he was "not allowed to work, go to school, possess any NGE materials, communicate with any NGE members incarcerated or not, nor participate in any NGE daily rituals and/or activities (e.g. studying lessons)." *Id*., ¶28. Plaintiff also alleges that in order to remove his STG designation, he was coerced into signing forms renouncing his membership in a religious group. *Id.*, ¶¶ 27, 33.

Plaintiff acknowledges that his own STG designation has been removed. *See* Response to previous Motion for Summary Judgment, *Docket #47* at 1. Plaintiff now seeks injunctive relief in the form of the removal of STG designation from the NGE, and requiring Defendants "to allow Plaintiff to possess literature and any publication coming from the NGE that is not violative of any other MDOC policy and procedure." *Complaint* at 8.

On August 8, 2007, I filed a Report and Recommendation ("R&R"), recommending (1) that claims against the Defendants in their individual capacities be dismissed on the basis of qualified immunity and (2) that the Defendants' motion for summary judgment be denied as to Plaintiff's claims "for injunctive relief requesting the removal of the NGE's designation as an STG and the MDOC's denial of religious literature to the group's member pursuant to RLUIPA." On September 27, 2007, Judge Cohn adopted the R&R, refining the issues as follows:

> "The case continues on only plaintiff's claim for injunctive relief (1) requesting the removal of the NGE's STG designation and (2) the MDOC's denial of religious literature to the group under RLUIPA." *Docket #51*, p.6.

Counsel was assigned to represent the Plaintiff, pursuant to this Court's *pro bono* program. Following discovery, both parties have filed motions for summary judgment.

-2-

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate.  *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added).  If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at

### III.   ANALYSIS

#### A.   Legal Principles

The controlling statute in this case is RLUIPA, which states in pertinent part:

"No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000cc-1(a).

Thus, a more stringent, less deferential standard is applied to an RLUIPA claim (the least restrictive means of furthering a compelling governmental interest) than to a First Amendment/§1983 claim, where the institution must merely show that its restrictions on religious practices are reasonably related to legitimate penological interests. *See Cutter v. Wilkinson,* 544 U.S. 709, 715-16, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Under RLUIPA, the initial burden of showing a substantial burden on a religious practice lies with the Plaintiff. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004); 42 U.S.C. § 2000cc-2(b). The burden then shifts to the government to demonstrate that the compelling interest test is satisfied. *Id.*

A governmental practice, decision or regulation imposes a "substantial burden" on the exercise of religion "if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004). Stated differently by the Seventh Circuit, "a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable." *Civil Liberties for Urban*

-4-

*Believers, supra*, 342 F.3d at 761. "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter*, 544 U.S. at 721.

### B. Application

As reflected in my previous Report and Recommendation and in Judge Cohn's opinion and order denying summary judgment, a central question in this case is whether NGE is religious in nature, or whether it is simply a gang. If NGE is a "religion," then the MDOC's decision to classify it as an STG and to ban distribution of its publication, *The Five Percenter* and other literature, are subject to the demanding scrutiny of RLUIPA. On the other hand, if NGE is merely a secular "gang," then it is not protected by RLUIPA. Both Plaintiff and Defendants have submitted expert affidavits in support of their respective positions on this question.

#### 1. Plaintiff's View: NGE is a Religion

In support of his claim that NGE is religious in nature, and therefore entitled to protection under RLUIPA, Plaintiff has offered the affidavit of Dr. Ted Swedenburg, Professor of Anthropology and Middle East Studies at the University of Arkansas. *Plaintiff's Exhibit O*, Docket #77. Dr. Swedenburg, who earned his doctorate in the field of cultural anthropology, lists as among his areas of expertise "African-American Islamic movements." *Id.*, ¶ 3. He begins his analysis with anthropological (and hence case neutral) definitions of "religion," which include "ideas and practices that postulate reality beyond that which is immediately available in the senses." *Id.* ¶ 8, quoting Bowen, *Religions in Practice: An Approach to the Anthropology of Religion*, 2002. He also describes "religious practices" as "how beliefs in the sacred or the divine are materialized through everyday action." *Id.*

Dr. Swedenburg asserts that "[f]rom the perspective of the discipline of anthropology, the Nation of Gods and Earths...clearly constitutes a religion." *Id.* He arrives at this

conclusion based on the character of its teachings and its practices. In terms of NGE's canon, Dr. Swedenburg states:

> "As far as a relation to the divine or the sacred, the Nation teaches that divinity resides within, that the Black Man himself (one who has knowledge of self) is a God. Divinity, according to the Nation, is manifest here on earth, in humanity, and does not reside in some other, supernatural dimension. The Nation distinguishes itself from other religions (Chiefly Christianity) that assert the existence of a Supreme Being external to humanity. These religions, according to the Nation, have used the notion of a 'mystery god' and an afterlife to hoodwink, suppress, and enslave black people. In the understanding of the Nation, traditional Judeo-Christian views of the afterlife serve to mollify and pacify the masses." *Id.* ¶ 9.

Dr. Swedenburg further states, "In addition to having a conception of the divine or the sacred, the Nation constitutes a religion in terms of how it is practiced." *Id.* ¶ 11. He describes NGE's "everyday religious manifestations" as including beliefs, that are articulated through various texts such as the 120 Degrees, the Supreme Mathematics and the Supreme Alphabet; rituals and community celebrations; symbiology; and teaching and proselytism. As to the latter, he states, "The main themes of these teachings are: calls to education, self-improvement, self-worth and calls for peace within the community." *Id.* ¶¶ 11-17.

Although Dr. Swedenburg acknowledges that NGE is a relatively recent phenomenon, he states that it does have links to earlier Islamic movements, a fact which bolsters his conclusion that NGE is a religion. "The Nation of Gods and Earths is one among many religious groups within an Islamic orbit that grew up within the African-American community during the twentieth century and that preached a message of black empowerment." *Id.* ¶ 20. He describes NGE as an offshoot of the Nation of Islam.[2]

Finally, Dr. Swedenburg observes that the beliefs and practices of NGE are not uncommon among other religions. For example, their belief that divinity exists within oneself

---

[2] The Nation of Islam is treated as a religion, and accorded RLUIPA-protected status by the MDOC.

-6-

"is one that is shared by a number of other religions" with "Gnostic tendencies,"[3] including "various brands of Christianity, Judaism, and Islam, especially in Sufi and Shi'ite spheres." *Id.* ¶ 21. Also, NGE's use of the Supreme Mathematics and the Supreme Alphabet is analogous to numerological and similar beliefs that "are basic to the Jewish Kabbala, and are also shared by Isma ilis and Druze, esoteric offshoots from mainstream Islamic Shi'ism." *Id.* ¶ 22.

### 2. Defendants' View: NGE is a Gang

The Defendants have submitted a report prepared by G.V. Corbiscello, a Supervising Investigator with the Monmouth County, New Jersey Sheriff's Office. *Corbiscello Report, Defendants' Exhibit 13* [Docket #75]. Mr. Corbiscello has extensive experience as a law enforcement and corrections officer, including gang investigation. Like Dr. Swedenburg, he has served as an expert witness in cases involving the NGE.[4]

Mr. Corbiscello notes that like the MDOC, the New Jersey Department of Corrections classifies NGE as a security threat group, and membership in NGE can result in an inmate being classified to the threat group. *Id.* at 2-3. The Report summarizes the history of NGE, stating that its founder, Clarence Edward Smith Jowers, joined and was active in the Nation of Islam (NOI) in the early 1960s, changing his name to Clarence 13X. He notes that the teachings of NGE derive from those of NOI, and describes those teachings as follows:

> "After his being cast out [of NOI], Clarence 13X started a following of his own. He is suspected of having taken the teachings of Master Fard, founder of the Nation of Islam, and given them to his followers to study and live by. These 'Lost and Found Lessons' form the basis of the rhetoric of the Five Percent Nation of Gods and Earths. Clarence 13X in fact developed the very name of his organization from the initiation rights of Fard, which include the following calculations:
>
> - Eighty-five percent of the world is of color–not merely Black people, but all

---

[3] Dr. Swedenburg explains that "[i]n Gnostic conceptions, God is conceived as a spirit that is manifested in man and only in man." *Id.*

[4] Mr. Corbiscello gave testimony in a criminal case. *See Corbiscello Report,* pp. 1-2.

-7-

people who are not White.

- Ten percent of the world is White–Blue-eyed Devils or White Devils who befuddle the minds of the Black man with the Mystery God, who was created by the White man for that purpose.

> -The Mystery God's purpose was to make the Black man lose his willpower, and allow the White man to enslave the Black man.
>
> - The eighty-five percent are kept asleep through their belief in the Mystery God of the White Devil.

- Adding the eighty-five percent and the ten percent figures, ninety-five percent is reached. That leaves a remainder of five percent. This Five Percent is the group on the path to righteousness, whose mission is to find the eighty-five percent and put them on the righteous path, and lead them to freedom and equality." *Id.* at 3-4.

Mr. Corbiscello goes on to describe some of the beliefs discussed by Dr. Swedenburg, in particular the Supreme Mathematics and the Supreme Alphabet. Mr. Corbiscello states that "[t]he Supreme Mathematics is actually the highest system of mathematics used to give value to numbers in addition to quantity. The system is properly used to maximize man's logic to solve living problems." *Id.* at 5. According to the Report, the digits 1 through 9 and zero are each ascribed meaning. For example, "1" is knowledge, "2" is wisdom. Interestingly, 7 is "God." *Id*.

In describing the Supreme Alphabet, Mr. Corbiscello notes its relationship to earlier teachings of the Nation of Islam:

"The Supreme Alphabet is a system of interpreting text and finding deeper meaning in the original muslim lessons or question and answers written by Elijah Muhammad and Wallace Fard Muhammad by assigning actual meanings to the letters of the roman alphabet. it was developed by Clarence 13x, after splitting from the Nation of Islam, after which he developed his *Supreme Understanding*." *Id*.

Nevertheless, Mr. Corbiscello opines that NGE is in fact a criminal gang, based primarily on law enforcement reports. He notes that there is some overlap in membership between the NGE and the United Blood Nation (the "Bloods"), and that "[o]ne of the founders of the Bloods in NY City's Rikers Island was himself a Five Percenter." *Id*. at 7.

He states that the "level of criminal activity [associated with NGE] has diminished a great deal due to the rise of the Bloods," and that "many subjects previously identified as Five Percenters have moved to becoming Bloods for the purpose of criminal activity, although they are still follow[ing] the Five Percenter teachings." *Id*.

In characterizing NGE as a gang rather than a religion, Mr. Corbiscello cites a New Jersey Commission of Investigation report from 1993, titled "Criminal Street Gangs," which stated, "Behind the façade of culture with religious overtones, *elements of the Five Percenters* engage in a variety of criminal activities, primarily narcotics distribution. Only a small percentage shun criminal conduct and lead a 'pure righteous life.'" *Id*. at 7-8. (Emphasis added). He concludes as follows:

> "While not every member of the Five Percent Nation is in fact a criminal, and some of the membership does follow the rhetoric as a lifestyle choice, the group, as a whole, presents a condition where they are a security threat to a prison." *Id.* at 9.

He cites "anecdotal evidence" of a case in Philadelphia where an inmate allegedly used coded language in the Supreme Alphabet and the Supreme Mathematics to facilitate an escape attempt. *Id*.

The Defendants have also submitted NGE publications and statements to the effect that by its own admission, the group is not a "religion." For example, Defendants' Exhibit 2 [Docket #76] is the cover page from *The Five Percenter*, the newspaper that the MDOC has banned. The headline proclaims, "We are not a Religion." Exhibit 3 is a "National Statement by Dumar Wa'de Allah," which states, at p.1, "Gods and Earths, in 1996 the Nation is making it very clear, we are not muslims or muslim sons. Our Nation is not an organization, gang, *religious group* or splinter sect." (Emphasis added). The Statement goes on to differentiate NGE from the NOI, yet acknowledges that the study of the lessons of NOI founder Fard Muhammad is central to NGE cosmology:

> "The Father [Clarence 13X] taught us (Gods) that the more he studied the lessons and gained a Supreme Understanding of these lessons, he realized that

-9-

Master Fard Muhammad could not be Allah. The Father revealed to us, how the 30th degree in the 1-40 proved that the Blackman is God." (Page 2)

"Brothers and sisters, during a period of our development, we all had muslim names, also called the 99 attributes of Allah. In 1967, the Father told us we must change our names because we are not muslims. the Father began to teach that we are the Gods, and must create righteous names, because we are righteous by nature. Not only did we have to change our name, he told us that we had to create them from our own language. Next Allah taught us (Gods) why certain lessons had to be renewed." (Page 2)

"This National Statement is telling the world that the Nation of Gods and Earths are not muslims, that the original man, in his original state of mind, is the maker, the owner, the cream of the planet earth the Father of civilization and God of the universe." (Page 3)

"The seven (7) represents the true and living God, the Supreme Being, the Original Man on the planet Earth. When you reach this level of development, you begin to realize why the devil has manufactured different names for the original people on the planet Earth." (Page 4)

Exhibit 5, taken from the NGE website "5% Network,"[5] is a statement of "What we Teach." Among the nine precepts listed are:

3. That the science of Supreme Mathematics is the key to understanding man's relationship to the universe.

4. Islam is a natural way of life, not a religion.

7. That the blackman is god and his proper name is ALLAH. Arm, Leg, Leg, Arm, Head.

The Defendants have also proffered an article written by Mr. Corbiscello (Exhibit 7) and a Wikipedia article purporting to describe NGE.[6]

---

[5] http://www.allahsnation.net. The website also contains a statement of "What we Achieve," which includes the statement, "National Conciousness is the consciousness of our origin in this world, which is divine. As a nation of people we are the first in existence and all other peoples derived from us."

[6] It is questionable whether a Wikipedia article can be considered in a summary judgment motion under Rule 56. Interestingly, however, this article discusses the essentially theological underpinnings of NGE thought, thus corroborating Dr. Swedenburg's view that it is a heterodox religion rather than a gang. For example, the article states, "Furthermore, the Five Percenters, in referring to themselves as Supreme Beings, point out that most, if not all, ancient scriptures allude to the anthropomorphic

Finally, the Defendants offer anecdotal evidence that within the MDOC, two inmates identified as NGE members were disciplined for making race-based threats and provocative statements such as, "We have soldiers here who are not on callout for a reason." *Defendants' Response* [Docket #84] and Exhibit 1 (filed under seal).

### 3.    The Conclusion: NGE is Religious in Nature

Based on this record, I find that, for purposes of RLUIPA, the Nation of Gods and Earths qualifies as a religion, and there is no genuine issue of material fact on which a trier of fact could reasonably find otherwise. This conclusion is supported by the following factors.

First, in opining that NGE is a "religion," Dr. Swedenburg applies an objective, case-neutral definition of the term,[7] and makes a persuasive comparison between the beliefs and practices of NGE and those of other heterodox religions. Mr. Corbiscello, on the other hand, while obviously having experience with NGE members, approaches the question from the narrower perspective of a corrections and law enforcement officer. But even so, Corbiscello and Swedenburg agree on many points that would support the view that NGE has an essentially religious character, including the relationship between NGE and NOI (the latter undisputably being a religious group), and the tenets of NGE, including the Supreme Alphabet and the Supreme Mathematics as keys to understanding humankind and its relationship to the universe. Purely secular gangs, such as the Bloods, are not guided by similarly theological principles.

---

qualities of the gods of different religions, and that religious teachings over time have strayed away from this concept. The five Percenters use ancient teachings that predate monotheistic religions to verify their deity status."

[7] The anthropological definition of "religion" that Dr. Swedenburg applies parallels William James' definition, which was cited by the Second Circuit in *Patrick v. LeFevre*, 745 F.2d 153, 158 (2d Cir. 1984), quoting W. James, *The Varieties of Religious Experiences* (1910): "[T]he feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine."

-11-

The Defendants base their view that the NGE is a gang, rather than a religion, on two basic arguments: First, that the NGE itself claims not to be a religion, and secondly, that a critical number (in Defendants' view) of disruptive and/or criminal acts are attributable to NGE members, some of whom have cross-membership in gangs such as the Bloods.

By discounting the semantic and philosophical context in which the NGE uses the term "religion," the Defendants miss the significance of the group's decision to eschew that term. By "religion," NGE refers to sects or denominations that purport to worship an "unseen" god, or, using its terminology, a "mystery god," and in saying that they are not a "religion" in that sense, they seek to differentiate themselves from those theological systems that, in their view, have perpetuated the oppression of people of color. Dr. Swedenburg makes the point as follows:

> "The Nation asserts that it is not a religion but a 'way of life'. It should be understood that this claim is made in order to distinguish the Nation from religions which have used the notion of a 'mystery god' to exploit black people. The Nation also wants to assert its distinction from 'religions' which have been the cause of sectarian strife and conflict. From an anthropological point of view, this claim in no way negates the Nation's essential religious character. Instead, such assertions simply constitute another facet of the Nation's belief system and confirm the Nation's religious character." *Swedenburg Affidavit*, ¶ 10.

In *Marria v. Broaddus*, 2003 WL 21782633 (S.D.N.Y. 2003), the court rejected the argument that NGE's declaration that it was "not a religion" was dispositive. Holding that the Department of Corrections' argument was merely semantic, the court stated:

> "The weakness of DOCS' semantic argument is evident. While it is somewhat understandable that a group that refuses to describe itself as a 'religion' did not inspire immediate outreach from DOCS officials, the law of the Free Exercise Clause does not turn on mere semantic distinctions. *Cf. Graham v. Cochran,* 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, at *30 (S.D.N.Y. February 14, 2000) (Ellis, M.J.) (noting, in a similar case brought by a Five Percenter inmate, that 'just as calling one's beliefs a "religion" does not make it such for constitutional purposes, failure to label one's beliefs a 'religion' does not prohibit constitutional protection'). The significance of plaintiff's beliefs in his life is considerably more relevant than what plaintiff and other members of his community choose to call their beliefs-'a rose by any other name,' as the saying goes, 'would smell as sweet.' As already described in some detail, plaintiff has submitted substantial evidence that he has been a practicing

-12-

member of the Nation since August of 1994 and that he lives by the Nation's teachings and observes the Nation's holy days to the extent possible under DOCS regulations. Furthermore, plaintiff, the Allah School representatives, and an expert cultural anthropologist all testified that the Nation carries the same significance for its members as Christianity, Judaism, and Islam do for their adherents, and that the Nation's contrasting belief system means that one could not be a part of those religions and the Nation simultaneously. Overall, plaintiff has convincingly demonstrated the central significance of the Five Percenter belief system in his daily life and his understanding of that which he considers divine, which is in accordance with the William James definition of religion. Finally, it would be incongruous for us to reject the notion that the Nation's belief system is 'religious in nature' when it is, in several respects, more orthodox in both its practices and notions of the 'divine' than the belief systems espoused by other groups that currently receive religious protections. *Id.* at *11.

Viewing the NGE's rejection of the term "religion" in this light, the MDOC's reasoning that the NGE's statement "we are not a religion" in itself removes the group from the protection of RLUIPA, is in effect imposing the MDOC's orthodoxy (ie, its countervailing and narrower concept of "religion") on the NGE. Yet, the MDOC is no more an "oracle of theological verity"[8] than is this Court.

Nor is the fact that some members of NGE belong to gangs, or engage in disruptive or incitive words or actions, sufficient to equate the group as a whole with gangs such as the Bloods. History is replete with examples of religions that have followers who embrace both the sacred and the profane. Rejecting the defendant's attempt to paint NGE with a similarly broad brush based on the actions of some of its adherents, the *Marria* court observed:

> "We stress that we are not saying that there are not prisoners who would describe themselves as Five Percenters who have committed crimes or otherwise violated prison regulations. However, the limitations of this 'fact' should be obvious. *Cf. Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N .Y. March 27, 1997) ('The mere fact that inmates identified as Five Percenters have been involved in altercations with other inmates and guards does not establish that the literature at issue here caused those incidents.'). There are prisoners who would describe themselves as Catholics, Protestants, Jews, Muslims, NOI, etc. who likewise violate prison regulations, and it is easy to imagine a situation where the common ethnic or religious bond shared by members of a group could serve as the impetus for some to

---

[8] *See Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1030 (3rd Cir. 1981) ("Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy.").

band together and at times act cohesively, but no one would suggest that such facts preclude the classification of these recognized groups as religions deserving of First Amendment protection." *Marria*, at *19.

*Marriah* concluded that "we find the anectodal evidence that DOCS has presented insufficient to justify after the fact its decision to treat the Nation solely as a gang under RLUIPA." *Id*. at *18.

Moreover, as in *Marria*, the MDOC's reliance on this anectodal evidence appears to be more of a *post-hoc* rationalization than the true reason for designating the NGE as a Security Threat Group. The Plaintiff has submitted as Exhibit C [Docket #77] the affidavit of Patricia Caruso, the director of the MDOC, in a different case in the Western District of Michigan.[9] In ¶¶ 10-12, Director Caruso clearly states that the STG designation was and is based on the group's ideology:

> 10. Former MDOC Director William Overton determined the Nation of Gods and Five Percenters were a Security Threat Group on November 29, 2001.
>
> 11. Prisoners are prevent from being members of an STG.
>
> 12. The Nation of Gods and Five Percenters is still a Security Threat Group in the MDOC *based on their ideology*. (Emphasis added).

Yet, as explained above, the NGE's ideology is religious in nature. While it contains elements of racial exclusivity or superiority (i.e., that divinity resides within the black man), there is nothing in its canon that advocates violence or encourages criminal activity. To the contrary, Defendants acknowledged at oral argument that *The Five Percenter* publication is facially innocuous, as are the group's other texts, such as the Supreme Mathematics and the Supreme Alphabet. The group's website, www.allahsnation.net, stresses themes of spiritual awareness, self-improvement and black empowerment, not social disruptiveness.

By way of comparison, the Seventh Circuit in *Borzych v. Frank*, 439 F.3d 388 (7th Cir. 2006), affirmed a grant of summary judgment under RLUIPA to prison officials who banned *Creed of Iron, Temple of Wotan* and *The NPKA Book of Blotar*, religious texts pertaining to

---

[9] *Johnson v. Loss*, W.D. Mich. No. 07-CV-77.

-14-

Odinism, which entails the worship of Norse gods and espouses a theme of white supremacy. However, it was undisputed that those books, unlike the *Five Percenter* or other NGE texts, explicitly advocated violence against other races. The *Borzych* court concluded that "it is the means rather than the underlying racist view that the defendants contend (and we hold) may be forbidden in prisoners' reading matter." *Id*. at 391.

Thus, the Defendants' two principal arguments in support of its conclusion that NGE is a gang–that they claim not to be a religion, and that some NGE members are troublemakers–do not hold water. Rather, the affidavits, reports and exhibits submitted by both sides show overwhelmingly that by any objective standard, NGE must be considered religious in nature, and therefore deserving of RLUIPA's protection.[10]

### 4.  Compelling Interest / Least Restrictive Means

Having established the applicability of RLUIPA, the Plaintiff has also shown that the MDOC's designation of NGE as a STG, and the complete ban on distribution of the *Five Percenter* and other NGE publications, impose a substantial burden on the exercise of his religion. As Director Caruso stated in her affidavit (Plaintiff's Exhibit C), an inmate is prohibited from being a member of a STG, and hence Plaintiff cannot be a member of his chosen religion. Indeed, he indicates that his personal STG designation was removed only after he "renounced" his religion. This is the type of substantial burden that Queen Isabella would have understood in 1492. Moreover, access to *The Five Percenter* and other NGE publications falls within RLUIPA's definition of "religious exercise," that is "any exercise

---

[10] The *Marria* court put it this way:

"Here, DOCS proposes to treat exclusively as a gang a group that has had a law-abiding existence outside prison for the better part of 40 years, that is an offshoot of another group that DOCS considers a religion, and that has practices that largely resemble those of recognized religious groups, with the consequence that DOCS has banned literature which it concedes is facially innocuous as well as any other expression of religious identity associated with the group. In order for such a ban to be upheld, there ought to be some sense that DOCS is substantially correct in its decision to treat the group exclusively as a gang and not a religion." *Marria* at *15.

of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. sc 2000cc-3(g). "Any exercise" means any exercise. Dr. Swedenburg explains as follows the importance of the *Five Percenter*:

> "Because the Nation is a non-hierachical and decentralized organiztion (see below, paragraph 18), newspapers like *The Five Percenter* are very important vehicles for communicating with the Nation's adherents, explaining and elaborating upon the Nation's basic teachings, conveying information about Nation activities, and commenting upon current social and political affairs from the Nation's perspective." *Swedenburg Affidavit*, ¶ 13.

Likewise, *Marria* noted:

> "Furthermore, in a religious community that lacks both a formal organizational structure and a fixed place of worship, *The Five Percenter* newspaper serves as a central link and mechanism of communication, clearly falling within RLUIPA's broad protections of religious exercise 'whether or not compelled by, or central to, a system of religious belief.'" *Marria* at *13.

I find, then, that there is no genuine issue of material fact as to whether the MDOC's policies substantially burden the Plaintiff's religious practices. Under RLUIPA, it is therefore Defendants' burden to show that the designation of NGE as a STG and the total ban on *The Five Percenter* and NGE literature advances a compelling governmental interest, and that these impositions are the least restrictive means of vindicating that interest.

Of course, prison security is a compelling state interest. *Cutter v. Wilkinson, supra*, 544 U.S. at 725. However, Defendant has not shown that NGE, by virtue of its ideology or its texts, presents an existential threat to prison security. While some purported members of NGE may pose security problems, there is nothing in the NGE's teachings or publications, including *The Five Percenter*, that advocates violence. *See Borzych v. Frank, supra*. This is significant in view of Director Caruso's statement that the STG designation is based on NGE's *ideology*, which, while racialist, is religious in nature, and therefore entitled to protection under both RLUIPA and the First Amendment Free Exercise Clause. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("The Free Exercise Clause commits government itself to religious

tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must ... ensure that the sole reasons for imposing the burdens of law and regulation are secular.").

Therefore, outlawing the entire religion and imposing a total ban on the group's publications does not further an otherwise compelling state interest in prison security.[11]

Moreover, while prison authorities may, depending on the circumstances, be entitled to impose some restrictions on religious practices, the MDOC has not shown that its blanket prohibition on NGE membership and activity is the least restrictive means available to ensure prison security. In fact, Defendant's Exhibit 1 [Docket #84] shows that the Defendants have less restrictive means available to deal with miscreants and provocateurs who claim to be NGE members. The prisoners who made the threatening and incitive statements were disciplined, and removed from the general population. This type of solution focuses on the wrongdoers, rather than punishing an entire group based on the actions of some of its members. Another approach is that taken in *Marria* following remand. While the original *Marria* opinion found an RLUIPA violation in the STG designation and the total ban on *The Five Percenter*, the court remanded for the defendant to reevaluate other restrictions, such as limitations on meetings, classes and congregate services. Following remand, the court held that while one-on-one meetings with outside NGE volunteers was permissible, the prison did not violate RLUIPA by prohibiting NGE members from congregate services in the prison. *Marria v. Broaddus*, 2004 WL 1724984, *2 (S.D.N.Y. 2004) (*Marria II*).

Consistent with *Marria II*, I do not suggest that the MDOC is precluded from placing any restrictions whatsoever on the NGE or any other religious group. For example, based on

---

[11] To the extent that the NGE might send a future publication that explicitly advocated violence, that particular publication could arguably be removed from circulation without violating RLUIPA. *See Borzych v. Frank, supra*. In the context of the present litigation, however, that scenario remains hypothetical.

-17-

the Defendants' evidence, particularly Exhibit 1, they may be entitled, under RLUIPA, to restrict or limit group meetings of NGE members. That question, however, is not before the Court. The only issue is whether the Plaintiff is entitled to injunctive relief regarding (1) the removal of the NGE's STG designation and (2) the MDOC's denial of religious literature to the group under RLUIPA. For all of the reasons discussed above, the Defendants have not shown a genuine issue of material fact on which a trier of fact could reasonably find in their favor on these narrower issues.[12]

## IV. CONCLUSION

I recommend that Plaintiff's Motion for Summary Judgment [Docket #77] be GRANTED, and that Defendants' Motion for Summary Judgment [Docket #76, amending Docket #75] be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

---

[12] I recognize that the *Marria* decision followed a five-day trial. However, a central issue in *Marria* involved the sincerity of the plaintiff's religious beliefs, a question almost always reserved for a trier of fact, who must "assess the claimant's demeanor at trial and 'delve into the internal operations of the claimant's mind and in turn assess the sincerity of the held beliefs and the place occupied by such beliefs in the plaintiff's life.'" *Marria* at *7 (internal citations omitted). Here, as the parties acknowledged at oral argument, the sincerity of Plaintiff Hardaway's beliefs is irrelevant to the question of whether the NGE as a whole is properly designated an STG, and whether a complete ban on NGE literature violates RLUIPA. Indeed, counsel acknowledged that if, for example, the ban on *The Five Percenter* (a publication acknowledged to be innocuous on its face) is enjoined under RLUIPA, even non-NGE members would be entitled to receive it, much the same as a non-Muslim would be entitled to receive the Koran, or a non-Christian a copy of the New Testament. Thus, summary judgment can be granted in this case based on the exhibits and affidavits that have been submitted, without reference to the Plaintiff's own subjective beliefs. This is not to say, however, that the MDOC may not undertake its own sincerity inquiry if Plaintiff should seek other accommodations, such as a religious diet or restrictions on his work assignments.

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.

The response shall address specifically, and in the same order raised, each issue contained within the objections.

        S/R. Steven Whalen
        R. STEVEN WHALEN
        UNITED STATES MAGISTRATE JUDGE

Dated:  August 17, 2009

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 17, 2009.

        s/Susan Jefferson
        Case Manager